HEARD NOVEMBER TERM, 1875.

ADAMS *vs.* KIBLER.

Where the object of an executed contract for the purchase of land has been defeated by the purchaser's eviction by paramount title from part of the land, equity will rescind the contract, though there was no fraud, but only mistake, on the part of the vendor.
In decreeing the rescission, equity will require the purchaser to account for the rents and profits of the part from which there was no eviction, during the time he used and occupied the same, and also for waste committed thereon by him.

BEFORE MACKEY, J., AT LANCASTER, MARCH TERM, 1875.

Action by John Adams and Bartlett F. Massey, plaintiffs, against Andrew J. Kibler, defendant.

The case contained in the brief is as follows :

On the 25th day of November, 1862, John Adams bought from Andrew J. Kibler and W. L. Faulkner, executors of the will of James Faulkner, deceased, at public auction, a body of land lying in the County of Lancaster, represented to contain 620 acres belonging to the estate of their testator, at the price of $11.25 per acre; and on the same day executed, to said executors, two sealed notes, to secure the payment of the purchase money, with his co-appellant, Bartlett F. Massey, and one John M. Crockett and one J. W. Twitty as sureties, each made payable for the sum of $3,487.50, bearing interest from date; the one falling due on the 28th day of November, 1863, and the other the 28th day of November, 1864.

In the Spring of 1867, W. L. Faulkner having died in the interval, Kibler, the survivor, instituted suits in the law Court on the notes, against the above named obligors,—which at the date of the trial in the Circuit Court were still pending against the plaintiffs, Adams and Massey.

On the 4th day of February, 1869, the plaintiffs and John M. Crockett, now deceased, filed their bill in the Equity Court, in this case, alleging outstanding paramount title to four hundred and forty-five acres of the land in the heirs at law of one Amelia V. Hooper, and that they had instituted suit in the law Court for the recovery thereof, and praying that a further prosecution of suits on the notes aforesaid be restrained, and that the contract in relation to the purchase of said land be rescinded.

On hearing the bill, an order was made restraining the further prosecution of the suit, to endure until the further order of the Court.

In the meanwhile, Andrew J. Kibler, having been vouched, came in and defended the title of his testator, James Faulkner, in the action for the recovery of the land against Adams. Nevertheless, on the trial, the heirs at law of Amelia V. Hooper, by the judgment of the Supreme Court, recovered 445 acres thereof, the same being that portion known as the Hooper tract.

It was alleged, on behalf of the plaintiffs, that upon this tract was located a substantial and commodious dwelling house, with the necessary outbuildings, including barn, stables, gin house, screw, standing at the intersection of two public highways, making the whole a desirable country residence, especially for one engaged in the business of agriculture. The tract adjoins lands of the said B. F. Massey, who, previous to the sale, had become the husband of the daughter and only child of Adams, who was at that time possessed of means which fully enabled him to purchase the same as a home for his son-in-law and daughter, whose land adjoining contained no dwelling place suitable for persons in their circumstances and condition in life. Accordingly, in 1866, they removed to and took possession of the same as a home.

After the recovery of this tract by the Hooper heirs, viz., on the 3d of June, 1873, the plaintiffs, Adams and Massey, by leave of Court, filed their supplemental complaint, setting forth the recovery and alleging that the sole motive and object of the entire purchase of the land was thereby utterly defeated; that the portion of land recovered by the Hooper heirs was valuable because of the improvements thereon and the fine quality of this land; but the remainder of the land (the Thompson tract) was cut down, worn out, without buildings and totally unimproved, and claiming an entire rescission of the contract and a perpetual injunction of the suit on the notes given for the purchase money.

The original complaint charged that the sale of the land in November, 1862, was affected by the depreciation in Confederate money.

The answer of the defendant, A. J. Kibler, denies that the land brought at the said sale more than its gold value; denies that the part recovered from Adams (the Hooper tract) formed the sole inducement for the purchase, and denies that the remaining land (the Thompson tract) was, at the time of said purchase, "cut down, worn out and totally unimproved," as stated in the complaint; avers that the executors of Faulkner, in conveying the whole of said lands to Adams, only conveyed the interest of Faulkner therein, and that the purchaser assumed by his purchase all risk of the soundness of Faulkner's title and is liable for the whole debt; and if not liable for the whole debt, he is liable for the value of that portion of the land (the Thompson tract) not recovered from him.

Testimony was taken upon the question of fact indicated above, viz., as to the inducements of the plaintiff for the purchase, the condition of the land and the respective values of the Hooper and Thompson tracts, in good money, at the time of sale. In support of the plaintiff's claim, the following testimony was given:

The plaintiff, J. Adams, testified: That the land recovered from him was the improved portion; it contained a good dwelling house and all necessary out-houses in good repair, good well of water, &c.; located near the Waxhaw Church; that his motive for buying the place was, that, being in easy circumstances, he wished to provide a home for his son-in-law, whose land it joined, and one, too, to which he might retire; no suitable place for building on the plantation of his son-in-law; but for the Hooper tract would not have bought the remaining 175 acres at any price; the Hooper tract was the sole inducement for the purchase, chiefly because of the buildings on it.

Cross-examined: The portion of land not recovered by the Hooper heirs is known as the Bobby Thompson place; contains 175 acres; was partly enclosed by fence, that is, on the East and West; on the North there was an old fence; there may have been a fence all round, or on all sides, except the Hooper tract, when witness purchased; witness has cultivated a portion of this land up to the present year; not more than ten or twelve acres any one

year; say years 1870, 1871 and 1872; knows the fact that B. F. Massey did cultivate this land prior to year 1869, but the amount of land and years he does not know. Witness had charge of the land in 1863, 1864 and 1865; turned it over to Massey in 1866, who had the management of it until 1870; none of the 175 acres was cleared up while witness owned the land; there was a comparatively fresh field cleared up by Faulkner, but that is run all into gullies.

B. F. Massey testified : Knows the place sold by the executors of Faulkner to Adams; composed of two tracts—the Hooper and Bobby Thompson or Cousart tract; 445 acres in the Hooper and 175 in the other tract; would not consider the Bobby Thompson tract very valuable, taken from the Hooper tract; little wood on it except old pine trees; witness is the son-in-law of Adams; was acquainted with his circumstances when he purchased; he had but one daughter, now the wife of witness; apart from the Hooper land, Mr. Adams, as a reasonable man, could have had no motive for the purchase he made; the heirs at law of Mrs. Hooper were witness, his half brother and sister; they brought suit to recover this land and succeeded; action was brought against Mr. Adams, the father-in-law of witness; the plantation of witness adjoins this purchase of Adams; it has no dwelling house fit for use by his family. He and his family reside at this time on the Hooper place; moved there in March, 1866; first house occupied by witness and family after his marriage; went there by the consent of Mr. Adams; Kibler defended the action brought to recover the land; witness returned from military service in 1865; had been in service from the year 1862, nearly all the time of his marriage, up to the year 1865.

Elihu Moore, witness for defendant, testified : Witness knows the land sold in 1862 as estate land of James Faulkner, and purchased by J. Adams; resides now, and resided then, within a few hundred yards of the place; is acquainted with both tracts, the Bobby Thompson and Hooper tracts; considered without reference, *i. e.*, the buildings, &c., the Thompson land was of greater average value than the Hooper; taking the improvements into account, supposes the Thompson tract of equal average value per acre with the Hooper. The Thompson tract was cultivated by Adams from the time of the sale up to the present time; last year about five or six acres; the year before not a great deal—say about a one-horse

farm. When Mr. Adams bought the Thompson tract there was about six or seven acres of original forest on it; six or seven acres well timbered; some old field pines; not well timbered when Mr. Adams                    ; a great deal of the oak timber cut down. Witness thinks that the greater part of the timber was cut in the year 1868 or 1869, thinks 1869; Adams told witness at that particular time that he had got 1500 rails from it; means that Adams had split 1500 rails that Winter season; don't think he has split any more rails since that time, but has seen Mr. Adams or Mr. Massey's wagon hauling wood from that place; can't say positively as late as last Winter; all of the fencing was taken from the Thompson tract, and moved to about the line between the Hooper and Thompson tracts; not sure where the line is; knows where one corner is; straight line from there to where it strikes the Massey land; part of the fence moved is still on the Thompson and part on the Hooper tract.

Cross-examined: Don't know where the line between the Hooper and Thompson tracts strikes the Massey land; can't say how much of the fence which Adams and Massey built with rails taken from the Thompson tract is on the Hooper, and how much on the Thompson tract. Don't know where the line is; knows two corners of the Thompson tract; this tract is cut off from the road leading to Cureton's Ferry and the Waxhaw Church; it is surrounded by plantations; no road to it except through the fields; there was an old road to it, but it has not been used since the war; this road was fenced up until 1868 or 1869; this road led through Buck Massey's place; no site for a house convenient to a public road; when Adams bought the Thompson place, only one dwelling house; no other beside the dwelling house; when Adams bought, there was a nice situation and dwelling place on the Hooper tract; good dwelling house, with all necessary outbuildings; situate in the fork of the road to Cureton's Ferry and Landsford, skirting 300 yards on the Cureton's Ferry, and half mile or more on the New Town road and across the road; at the time of the purchase there was on it a gin house, a good well of water and a good deal of timber. The Thompson tract is totally broken, but not much more than the Hooper tract.

R. H. Crockett testified: That he knows the lands; the Thompson tract was worth twice as much as the Hooper tract, even taking into consideration the buildings on the Hooper tract; the Thomp-

son tract was worth ten dollars an acre, witness thinks, in good money; thinks there was a small dwelling house on Thompson tract at time of sale.

Cross-examined: Hadn't seen the Thompson tract for a number of years before sale.

James Thompson testified: Knows land in question; the Thompson tract was most valuable per acre; worth eleven dollars per acre at the time of the sale; thinks that the Hooper was worth at that time, including improvements, six or seven dollars per acre; don't think there were any improvements on the Thompson tract at the time of sale, but it was in a very good fix for farming; has not seen it since about eighteen months ago; the whole tract sold for about eleven dollars per acre.

J. H. Lathen testified: The Thompson tract on the day of sale was worth a great deal more than the Hooper per acre; would as soon have had the Thompson tract as all the other.

Cross-examined: A good deal of the land in question made a bale to the acre; would value Thompson tract at ten dollars per acre, and Hooper land at five or six dollars an acre.

A. J. Kibler, defendant, testified: Knows the land in question; the Thompson tract much the best farming land; worth twice as much as the Hooper; Mr. Faulkner, the testator; principal farm was on the Thompson tract; saw this tract last about two years ago; it had no fence around it then.

Cross-examined: There was a common dwelling house on the Thompson tract, which was habitable on day of sale; it was a small log building with two rooms—that is, one room and a shed room.

Re-examined: The land in question was worth $11.25 per acre when sold, in good money; it brought that at the date of sale. There was no difference between Confederate money and good money here in selling land and corn, &c.; corn sold at that sale at one dollar per bushel, the price before the war.

Re-cross-examined: We received Confederate money at that sale at par.

Defense here rested, and, after hearing argument of counsel, the following decree was pronounced:

MACKEY, J. This cause came on to be heard upon the bill, answer, testimony and argument of counsel.

The Court ascertained the facts to be:

1. That on the 25th day of November, 1862, the plaintiff, John Adams, purchased from the executors of James Faulkner, deceased, a certain plantation, consisting of two tracts—the Hooper tract, containing 445 acres, more or less, and the Bobby Thompson tract, containing 175 acres, more or less, the same having been sold as 620 acres, more or less, for the sum of $6,975, being at the rate of $11.25 per acre.

2. That in the year 1872, plaintiff, Adams, was evicted from the Hooper tract, but still retained the Bobby Thompson tract, which was relatively the more valuable of the two tracts, as testified by the witnesses, and worth the price paid.

3. That the Thompson land has become worn and deteriorated in condition and value by use and culture during the twelve years of occupancy by John Adams, and cannot now be restored in the same condition as at the time of sale.

As matter of law, it is adjudged and decreed:

1. That the defendant, A. J. Kibler, be perpetually enjoined from collecting from the plaintiff, John Adams, or his sureties, on the notes given for the purchase money of the said land, so far as concerns the Hooper land, from which said plaintiff was evicted.

2. That the said John Adams and his surety, Bartlett F. Massey, do pay to the defendant, A. J. Kibler, as executor, the sum of one thousand nine hundred and sixty-eight dollars and seventy-five cents, being the price of the Thompson tract—175 acres at $11.25 per acre—with interest on said sum from the 26th day of November, 1862, and that defendant have leave to enter up judgment and have execution therefor.

From this order the plaintiffs appealed on the following grounds:

1. Because, it is respectfully submitted, His Honor erred in not decreeing an entire rescission of the contract in relation to the sale of the land therein mentioned.

2. Because the evidence in the case fully established that the said contract was made with reference to Confederate currency, as a basis of value, and His Honor erred in not grading down the price of the Bobby Thompson tract to the good money standard.

3. Because the value of the Bobby Thompson tract, apart from the main body of the land, was not one of the issues in the cause,

and His Honor should have directed an issue to ascertain its relative value.

*Moore*, with whom was *Allison*, for appellants:

But the simple and only question in the case is: Have the plaintiffs the right to a rescission of the contract in relation to the entire body of land sold by the defendant?

1. The testimony of the plaintiffs, Adams and Massey, taken in connection with the attendant facts and circumstances, it is submitted, clearly indicates that the portion of the land known as the Hooper tract (445 acres) was not only the principal but the sole object of the purchase by Adams. Upon this portion of the land was located all of the improvements of any value—a good and substantial dwelling house, with all the necessary outbuildings, well of water, &c. The only daughter of Adams, then a man in easy circumstances, had not long before become the wife of Massey. The husband's landed estate lay adjoining the Hooper portion of the land, but contained no dwelling house or other place of residence suitable for the accommodation of the newly-married pair. What more natural than that a parent should desire to supply this important deficiency for an only child?

On the other hand, the Thompson tract (175 acres) offered no such inducements for the purchase. A comparatively small tract, somewhat remote from any public highway, and, according to the testimony, almost inaccessible by any traveled way whatever, with but a single log building upon it, which was evidently much dilapidated and had fallen into disuse as a human habitation for any one, disassociated from the Hooper tract, it could have presented no reasonable motive for its purchase by Adams; and accordingly he swears he would not have purchased it alone at any price.

It cannot be doubted, therefore, but that the representation by the executors of Faulkner that the Hooper tract formed a portion of this land which they offered for sale was the sole inducement for the purchase by Adams.

Whether this misrepresentation on their part was intentional or not, equity will afford relief to the purchaser.— *Glover* vs. *Smith*, 1 DeS. Eq., 433; *Grey* vs. *Handkinson*, 1 Bay, 278; *State* vs. *Gaillard*, 2 Bay, 11; *Kibler* vs. *Cureton*, Rich. Eq. Cases, 143; *Van Lew* vs. *Parr*, 2 Rich. Eq., 321.

From the cases of *Gillam* vs. *Briggs*, (Rich. Eq. Cases, 432,) and *Van Lew* vs. *Parr*, (2 Rich. Eq., 321,) in equity, and the law cases of *Carter* vs. *Carter*, (1 Bail., 217,) *Bordeux* vs. *Cave*, (*id.*, 250,) and *Westbrook* vs. *McMillan*, (*id.*, 259,) it is submitted, the following rules are deducible:

1. That, after conveyance, the law Court cannot rescind or set aside a sale of land merely for defect of title, either partial or total, but that in an action on the obligation given for the purchase money by the vendor the vendee may avail himself of such defect of title, by way of failure 'of consideration, either before or after eviction. In case of total want of title in the vendor, the obligation to be regarded as a *nudum pactum* and void.

2. That where a total want of title in the vendor has been ascertained by the eviction of the vendee, equity will interfere and decree a rescission, whether the contract be *in fieri* or fully executed, but will refuse to interfere (unless under very special circumstances) where there has been no eviction.

3. That where there has been a partial want of title in the vendor, ascertained by the eviction of the vendee from that portion of the real estate sold which constituted the principal motive for the purchase, equity will interfere and decree a rescission of the entire contract, but will, at the same time, proceed to make such further decree as will restore the parties, as far as practicable, to the condition in which they would have been had no such contract been made.   ·

In this case, Adams has been evicted of nearly two-thirds of the entire land sold, including that part containing the dwelling house, &c., which constituted not only the *principal* but the sole object of the purchase. The misrepresentation by the executors of Faulkner, that they had the right to sell this part of the land in connection with the Thompson tract, was, it is conceded, unintentional; while, therefore, under the rule last above mentioned, the Circuit Court should have decreed a rescission of the entire contract and a reconveyance (if necessary) of the Thompson tract, Adams should have been only required to account for the value of the rents and profits of the Thompson tract and for any waste that may have been committed on the same while in his possession.

III. But, conceding that the appellants are not entitled to a rescission of the entire contract, and that the "Hooper" and "Bobby Thompson" tracts were, at the date of the sale, of equal relative

value per acre, inasmuch as the sale was made on the basis of Confederate currency, (see testimony of the defendant, A. J. Kibler,) the price of the Bobby Thompson tract should have been graded down to the good money standard and the appellants decreed to pay only the value, in good money, of $1,968.75 in Confederate currency on the 25th day of November, 1862, viz., the sum of $845.48.—*Parker* vs. *Wilson*, 3 S. C., 296.

IV. Again: The decree does virtually rescind or annul the contract between the executors of Faulkner and the appellants, because it was out of the power of the Court, without destroying, so to alter the same as to require the appellants to pay the same price per acre for a part of the land which Adams had contracted to pay for the whole body. It follows that, instead of decreeing the payment for the land, which Adams never would have purchased by itself, he should have been directed merely to account for the rent of the same and any waste that may have been committed.

V. The value of the Thompson tract, apart from the main body of the land bought by Adams, was not in issue in this cause. It was, therefore, error to determine its value, at least without first directing an issue, so as to have enabled Adams to produce evidence in relation to the question.

VI. But unless the decree does amount to a rescission of the entire contract, the complaint should have been dismissed without prejudice and the parties left to litigate their rights before a jury in the action pending on the obligation given for the purchase money of the land.

*Kershaw*, contra :

The questions arising under this appeal are :

1. Whether the partial failure of consideration proven in this case entitled the appellants to a rescission of the entire contract.

If it was a total failure, it might have been under the rule in *Gray* vs. *Handkinson*, (1 Bay, 276,) and *Tucker* vs. *Grimke*, (4 DeS., 53.)

Or if there were a very great deficiency, so as entirely to defeat the objects for which it was purchased, as in *Glover* vs. *Smith*, (1 DeS., 433.)

Unless he had notice.— *Wainwright* vs. *Reed*, 1 DeS., 573.

The leading case is that of *Moore & Nesbit* vs. *Lanham*, (3 Hill, 304,) where the authorities are collected and explained.

· The rule deduced is, "that on the sale of lands, the failure of title as to part only of what is conveyed is a breach of warranty, or implied covenant of seizin, which will entitle the vendee to his action at law, in case he has paid the price, or to an abatement, in case he be sued to recover it.—*Evans* vs. *Denby*, 2 Sp., 8; *Means* vs. *Brickell*, 2 Hill, 657.

The rule is peculiar to South Carolina, and is derived from the civil law, which implies in every sale a warranty of title, and "ought not to be extended."—*Hood* vs. *Huff*, 2 Mills, 159.

But there is no implied warranty at a sale by a public officer.—*Commissioner* vs. *Thompson*, 4 McC., 434.

Nor at a sale by an administrator.—*Prescott* vs. *Holmes*, 7 Rich. Eq., 1.

It rests, therefore, in this case, solely upon the ground of failure of consideration, and the question is one of fact. How far has the consideration failed?

This has been properly settled by the Court, and the evidence sustains it.

2. Whether the contract should have been reduced to the value of Confederate money.

The proof establishes that the contract was not made with reference to a depreciated currency.

3. Whether the value of the land left in possession of appellant, with unquestioned title, was one of the issues in the cause.

This is sufficiently answered in stating the question.

4. Whether there should have been an issue ordered to try the value.

The issue in this case arises under Section 277 of the Code of Procedure and is triable by the Court.

The relief sought was equitable relief and the issues were competent to be tried by the Court.—Wait's Ann. Code, 445, note c.

February 17, 1876. The opinion of the Court was delivered by

MOSES, C. J. The right of the appellants (the plaintiffs below) to a rescission of the contract is resisted, because, as it is alleged by the respondents, there was only a partial failure of consideration—the eviction by an outstanding title not extending to the whole land sold by the executors of Faulkner to Adams.

· The power of the Court of Equity to afford relief, where its interposition is sought to redress a loss caused by a failure of con-

sideration, would indeed be narrow if limited only to the extent of affording reparation by a proportional abatement of the price agreed to be paid for the subject matter of the contract. In the purchase of a tract of land, while the diminution in quantity might attach only to a few acres, the effect of even such a loss might so depreciate the whole for the purpose intended by the purchaser as to render the retention of the remaining part entirely profitless and undesirable to him. One buying a plantation, with a view to its cultivation, is generally' not more influenced by the number of acres it may contain than its adaptation as a whole to the purpose he contemplates in the investment. To obtain a particular location for a special object to which he proposes to devote it, he may be willing to pay for a larger extent of territory merely to possess a specific portion which it includes, and which may form the only inducement which has led to the purchase. Some of the cases have gone so far as to hold, as in *Glover* vs. *Smith*, (1 DeS., 433,) that a deficiency of 101 acres in the supposed purchase of 662 acres would be a ground for the rescission of the contract if the purchase would be greatly deteriorated by the decrease.

In the earlier decisions it was held that if the object of the purchase was defeated by a loss through an older grant of that portion which induced it, the vendee might, even when sued on the bond at law, claim a rescission of the contract by a verdict in his favor.— *Gray* vs. *Handkinson*, 1 Bay, 278; *State* vs. *Gaillard*, 2 Bay, 11. On these authorities rested the conclusion of the Courts as to the admissibility of parol testimony in a suit at law to show a failure of consideration by a deficiency in the quantity of land sold and conveyed, and to claim an abatement in the price in consequence of it. The decisions are fully reviewed in *Means* vs. *Bricknell*, (2 Hill, 657,) and the doctrine affirmed. Neither is its application confined to cases where the misrepresentations are with a fraudulent design, for even if made through mistake, yet if they formed an inducement to the contract, they constitute a good defense to the action. The effect upon the purchaser is not changed by the motive and intent of the misstatements of the seller. It may be conceded, as is said by Johnson, J., in *Johnson* vs. *Purvis*, (1 Hill, 236,) "That the impracticability of giving effect to the defense in a Court of law where a total rescission of the contract is claimed is a sufficient justification for referring it to the chancery jurisdiction." There all the equities of the several parties can be more properly

adjusted, and the whole matter adjudicated by such orders as may secure their relative rights. The point now before us is submitted by a complaint, which prays that the collection of the notes for the purchase money may be enjoined and the entire contract rescinded. The relief is, therefore, sought by a "case of chancery," to use the language of the Constitution.

The application of the principles to which we have adverted must depend on the facts developed in the cause. Looking to the testimony adduced on the trial, the Court has not a doubt that the end and purpose of the appellant in the purchase was defeated through his eviction from the Hooper tract by a better title. The entire scope of the evidence is conclusive as to the incentive which urged the purchase. It was to acquire the very tract from which he was ejected as a settlement and residence for his son-in-law; and while he was willing to buy the body of land, including the Thompson tract, the two parcels constituting one plantation, there is nothing to prove that without the Hooper tract he would have purchased the other. The very fact on which the respondents relied, to wit, that the Thompson tract was worth eleven dollars per acre, while the Hooper tract was only worth six or seven dollars the acre, shows that he was willing to pay a price far above its value in order to consummate the end he designed by the purchase.

If, however, he bought the whole plantation with a view to its cultivation as an agricultural investment, can it be asserted with any show of reason that the buildings and improvements on the Hooper parcel and its eligible location, the Thompson piece, being, it may be said, without any, did not materially contribute to the inducements which influenced Adams in the contract? Is not this conception of his motives the only legitimate inference to be drawn from the testimony? There is something still beyond all this. The plantation contained, as it was alleged by the vendors, six hundred and twenty acres. Of these Adams has lost by a superior title four hundred and forty-five, leaving him but one hundred and seventy-five acres, the deficiency being over two-thirds, and the portion lost containing all the buildings and improvements necessary to the proper and ready conduct of a farming interest. It would be difficult in a search through all the decided cases to find a single one of the like character, where a party has been compelled to take the land while even allowed an abatement of the price for the deficiency. Can any one believe that if Adams, when he proposed to

buy, had been aware of the great difference he would have made the contract by which he is now sought to be bound? He relied on the statement of the respondents that the plantation contained six hundred and twenty acres, the Hooper tract constituting a portion, and we cannot see upon what principles he should be forced to take a title, when the disproportion of the quantity he contracted to buy is so very great.

While, however, the contract should be rescinded, the right of the parties which follows such result must be respected. It is, therefore, ordered that the agreement referred to in the pleadings be rescinded, the notes of the appellant and the conveyance executed to them cancelled and annulled, and the title to the Thompson land held to vest in the executors or the surviving executor of James Faulkner, the vendors to the said Adams. It is further ordered that Adams be required to account for the rents and profits of the Thompson place while he had possession of it, or for any waste he may have committed thereon. Each party to pay his own costs.

It is further ordered that the case be remanded to the Circuit Court for such orders as may be necessary to give effect to the conclusions herein expressed.

*Wright*, A. J., and *Willard*, A. J., concurred.